IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 18-14502-GG

———————————————

GEORGIA MUSLIM VOTER PROJECT,
ASIAN-AMERICANS ADVANCING JUSTICE-ATLANTA,

Plaintiffs - Appellees,

versus

BRIAN KEMP,
in his official capacity as the Secretary of State of Georgia,

Defendant - Appellant,

GWINNETT COUNTY BOARD OF VOTER REGISTRATION AND ELECTIONS,
on behalf of itself and all others similarly situated,

Defendant.

———————————————

No. 18-14503-GG

———————————————

RHONDA J. MARTIN,
DANA BOWERS,
JASMINE CLARK,
SMYTHE DUVAL,
JEANNE DUFORT,
THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC.,

Plaintiffs - Appellees,

versus

BRIAN KEMP,
Secretary of State of Georgia,

Defendant - Appellant,

REBECCA N. SULLIVAN, et al.,

                                                              Defendants.

_____

On Appeal from the United States
District Court for the Northern District of Georgia

_____

BEFORE: TJOFLAT, JILL PRYOR, and NEWSOM, Circuit Judges.

BY THE COURT:

On November 2, 2018, we denied the Emergency Motion for Stay of Injunction Pending Appeal filed by Appellant Brian Kemp and advised at that time that one judge dissented and separate opinions would follow. Today, we issue those opinions.

2

JILL PRYOR, Circuit Judge, concurring in the denial of the motion for a stay.

On the eve of the 2018 general election, and in the wake of a surge in interest in voting by mail in Georgia, the Georgia Muslim Voter's Project and Asian-Americans Advancing Justice-Atlanta filed suit challenging the State's lack of prerejection procedures for redress when an elector's signature on an absentee ballot application or absentee ballot appears not to match the signature on her voter registration card.   For such a perceived mismatch, the State offered only notice of rejection and an opportunity to try again, whether by mail or by voting in person. But for other absentee ballot deficiencies, the State offered a more robust system of prerejection notice and an opportunity to be heard.   Finding a likely violation of procedural due process, the district court entered an injunction in which it ordered the Secretary of State of Georgia to instruct county elections officials to provide prerejection notice and an opportunity to be heard in the event of a perceived signature mismatch.   In so doing, the district court borrowed heavily from existing voting procedures pertaining to other ballot deficiencies, which had been passed by Georgia's legislature and long followed by state and local officials, to craft a narrow remedy for a narrow class of ballot applications and ballots.

When the Secretary moved in this Court for a stay pending appeal from the injunction, we denied the stay, concluding that the district court had not abused its discretion in crafting the relief it ordered.   *See Cumulus Media, Inc. v. Clear*

3

*Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) ("[The district court's] judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them."). Our order denying the Secretary's motion issued days before the November 2018 election, and in it we noted that opinions would follow.   This is my opinion, written as if it had been issued contemporaneously with that order.[1]

## I.    BACKGROUND

### A. Georgia's Statutory Absentee Voting Scheme

Like many states, Georgia permits electors to vote by mail, for any reason, through a process it calls absentee voting.   *See* O.C.G.A. § 21-2-380(a), (b). Absentee electors must follow a two-step process, first applying for and second voting via an absentee ballot.   *Id.* §§ 21-2-381, -383, -384.   At both steps, an absentee elector must sign the application or ballot, and at both steps that signature is compared by elections officials to the elector's voter registration card signature. *Id.* § 21-2-381(b)(1) (absentee ballot applications); *id.* §§ 21-2-384(b), (c), - 386(a)(1)(B), (C) (absentee ballots).   If the county elections official

---

[1] I agree with Judge Newsom's concurring opinion that this case is now moot, since the election has passed. But one member of the panel dissented from our order denying the motion for a stay pending appeal, and he has since written a dissenting opinion explaining his reasons for declining to join the majority. I explain here why I believe the motion properly was denied.

reviewing submissions concludes that the signatures match at the application stage, an absentee ballot issues; if the signatures match at the absentee ballot stage, and there are no other deficiencies, the absentee elector's vote is counted. *Id.* § 21-2-381(b)(2)(A) (absentee ballot applications); *id.* § 21-2-386(a)(1)(B) (absentee ballots). If the official concludes that the signature on the absentee ballot application or absentee ballot does not match that of the elector's voter registration card, then the application or ballot is rejected. *Id.* § 21-2-381(b)(3) (absentee ballot applications); *id.* § 21-2-386(a)(1)(C) (absentee ballots). At issue in this case is the process offered to absentee electors whose signatures on absentee ballot applications and absentee ballots are deemed a mismatch.

Georgia law has no provision by which an absentee elector notified of a perceived mismatch may contest the decision, cure the mismatch, or prove her identity before the absentee application or absentee ballot is rejected for a signature mismatch. Instead, the law provides that after the application or ballot is rejected, the county board of registrars[2] or absentee ballot clerk is required to "promptly notify" the elector of the rejection. *Id.* § 21-2-381(b)(3) (absentee ballot applications); *id.* § 21-2-386(a)(1)(C) (absentee ballots).[3] The law does not

---

[2] County boards of registrars are empowered by state law to conduct primaries and elections and to oversee the registration of electors and absentee balloting procedures. *See generally* O.C.G.A. § 21-2-40.

[3] For example, within three days of rejection of an absentee ballot, Gwinnett County

5

prevent the absentee elector from trying again, either by filling out a new application or by completing a new ballot.   Nor does the law prevent an able absentee elector from voting in person, either during early voting hours or on Election Day.   Ga. Comp. R. & Regs. 183-1-14-.09.

Still, perceived signature mismatches are a bit of an outlier:   Georgia law provides *pre*rejection procedures for other flaws in absentee ballot applications and absentee ballots, just not for a signature mismatch.   If the registrar or absentee ballot clerk determines that an absentee ballot application lacks information such that the official cannot determine the absentee elector's identity, Georgia law provides that the official must "write to request additional information" from the elector instead of rejecting the application outright.   O.C.G.A. § 21-2-381(b)(4). If the board of registrars has probable cause to believe based on an absentee ballot that the "elector is not qualified to remain on the list of electors," the board must, "if practical, notify the challenged elector and afford such elector an opportunity to answer," and then "shall proceed to conduct a hearing on the challenge on an expedited basis prior to the certification of the consolidated returns of the election superintendent."   *Id.* § 21-2-230(b), (g).   If the absentee elector fails to prove her eligibility at this stage, she may appeal to the superior court within 10 days of the

---

provides the absentee elector with a letter stating the reasons for the rejection, a new application for an absentee ballot, and information about how to vote by other means.

6

board of registrars' decision.  *Id.* § 21-2-230(g) (cross-referencing O.C.G.A. § 21-2-229(e)).  If the board of registrars believes that an absentee ballot has some other deficiency that does not affect the elector's qualifications to remain on the list of electors—for example, if the absentee elector failed to provide the required identification—*and* "it is not practical to conduct a hearing prior to the close of the polls," then elections officials must treat the ballot as a "challenged" ballot—that is, a provisional ballot.  *Id.* §§ 21-2-230(e), (i), -386(e), -419.  If the absentee elector provides the board of registrars with the required identification no more than three days after the election, then her vote is counted.  *Id.* § 21-2-419(c)(1); Ga. Comp. R. & Regs. 183-1-14-.03(2), (3), (5).  If the absentee elector fails to do so, then the ballot is not counted and the absentee elector is so notified.  Ga. Comp. R. & Regs. 183-1-14-.03(5); O.C.G.A. § 21-2-419(d)(1).  If necessary based on these procedures, the election returns are adjusted and a corrected return is certified.  O.C.G.A. § 21-2-230(g), -493(l).  Again, under Georgia law these prerejection procedures are inapplicable to absentee ballot applications and ballots with perceived signature mismatches.

## B.  The Proceedings Below

The Georgia Muslim Voter Project and Asian-Americans Advancing Justice-Atlanta (collectively, "GMVP") caught wind of an October 12, 2018 news article reporting increased rates of rejection of absentee ballot applications and

absentee ballots in Gwinnett County due to perceived signature mismatches.    Four days later, the organizations filed suit in the Northern District of Georgia against Brian Kemp, in his official capacity as Secretary of State of Georgia,[4] and the Gwinnett County Board of Registrars and Elections, on behalf of itself and similarly situated boards of registrars in all 159 Georgia counties.    As relevant to this appeal, GMVP alleged that Georgia's absentee voting scheme violated procedural due process insofar as the State failed to provide prerejection notice, an opportunity to be heard, and a chance to appeal for absentee electors whose absentee ballot applications or absentee ballots contained a perceived mismatched signature.

GMVP moved for an injunction to prevent elections officials from rejecting absentee ballot applications and absentee ballots due to perceived signature mismatches without these prerejection procedures.    After holding a hearing, the district court determined that it was substantially likely that the Georgia's statutory procedures for rejecting absentee ballot applications and absentee ballots facially violated the Fourteenth Amendment's guarantee of procedural due process.    The district court found that the other factors courts consider in deciding whether to

---

[4] Secretary Kemp also was a candidate for governor of Georgia in the November 2018 election. He won that election, and a new Secretary of State has assumed his prior position. For ease of reference, I use the term "the Secretary" throughout.

8

grant injunctions—irreparable injury, harm to the opposing party, and the public

interest—also weighed in favor of granting injunctive relief.

The district court thereafter entered an injunction[5] in which it ordered the

Secretary of State's Office to issue the following instructions, reproduced in full

here, to all county boards of registrars, boards of elections, election

superintendents, and absentee ballot clerks:

> *1)* All county officials responsible for processing absentee ballots shall
> not reject any absentee ballots due to an alleged signature mismatch.
> Instead, for all ballots where a signature mismatch is perceived, the
> county elections official shall treat this absentee ballot as a
> provisional ballot, which shall be held separate and apart from the
> other absentee ballots. *See* O.C.G.A. § 21-2-419; Ga. Comp. R. &
> Regs. 183-1-14-.03(2). The county elections official shall then
> provide pre-rejection notice and an opportunity to resolve the
> alleged signature discrepancy to the absentee voter. This process
> shall be done in good faith and is limited to confirming the identity
> of the absentee voter consistent with existing voter identification
> laws. *See* O.C.G.A. §§ 21-2-417, -417.1. The elections official is
> required to send rejection notice via first-class mail and also
> electronic means, as available or otherwise required by law. *See*
> O.C.G.A. § 21-2-384(a)(2). This process shall include allowing the
> absentee voter to send or rely upon a duly authorized attorney or
> attorney in fact to present proper identification. This process shall
> be done prior to the certification of the consolidated returns of the
> election by the election superintendent. *See* O.C.G.A. § 21-2-
> 230(g). The absentee voter shall have the right to appeal any
> absentee ballot rejection following the outcome of the

---

[5] Although the district court labeled its order a "Temporary Restraining Order," GMVP
Doc. 32 at 2, it actually was an immediately appealable preliminary injunction. *See* 28 U.S.C.
§ 1292(a)(1); *Fernandez-Roque v. Smith*, 671 F.2d 426, 429 (11th Cir. 1982) (explaining that the
functional effect of an order controls and that an order is an injunction if, rather than "merely
preserving the status quo," it "grant[s] most or all of the substantive relief requested").

aforementioned process, as designated in O.C.G.A. § 21-2-229(e). Any aforementioned appeals that are not resolved as of 5 p.m. on the day of the certification deadline shall not delay certification and shall not require recertification of the election results unless those votes would change the outcome of the election. *See* O.C.G.A. § 21-2-493(l).

2) All county elections officials responsible for processing absentee ballot applications shall not reject any absentee ballot application due to an alleged signature mismatch. Instead, for all ballot applications where a signature mismatch is perceived, the county elections official shall, in addition to the procedure specified in O.C.G.A. § 21-2-381(b), provide a provisional absentee ballot to the absentee voter along with information as to the process that will be followed in reviewing the provisional ballot. The outer envelope of the absentee ballot provided shall be marked provisional. Once any provisional ballot is received, the procedure outlined in section 1 above is to be followed.

3) This injunction applies to all absentee ballot applications and absentee ballots rejected solely on the basis of signature mismatches submitted in this current election. This injunction does not apply to voters who have already cast an in-person vote.

GMVP Doc. 32 at 2-3.[6]

The Secretary filed an emergency motion to stay the injunction pending appeal, arguing that laches barred GMVP's claims and that GMVP was unlikely to prevail on the merits of the facial due process challenge.[7] Only the Secretary

---

[6] "Doc. #" refers to the numbered entry on the district court's docket. Unless otherwise noted, citations are to the *GMVP v. Secretary* case in the district court.

[7] Several electors and the Georgia Coalition for the People's Agenda, Inc. (collectively, the "Electors") separately filed suit against the Secretary, members of the Gwinnett County Board of Voter Registration and Elections, and members of the State Election Board. The State Election Board is tasked with promulgating rules and regulations that will "obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and

10

moved for a stay; the Gwinnett County Board of Voter Registration and Elections did not. The district court denied the Secretary's motion. The Secretary then filed in this Court an Emergency Motion for Stay of Injunction Pending Appeal. We summarily denied the motion for a stay. Judge Tjoflat dissented from our summary order denying a stay and now has provided his reasons for doing so. This is my response.

## II.    LEGAL STANDARDS

"A stay of a preliminary injunction requires the exercise of our judicial discretion, and the party requesting the stay must demonstrate that the circumstances justify the exercise of that discretion." *Democratic Exec. Comm. of*

---

other officials" and facilitate the "fair, legal, and orderly conduct of primaries and elections." State Election Board Duties, http://sos.ga.gov/index.php/elections/state_election_board (last accessed March 18, 2019).

The Electors brought substantive due process and equal protection claims arising from the rejection of absentee ballot applications and absentee ballots with perceived signature mismatches. The Electors sought an injunction on these grounds, rather than on the basis of procedural due process. Without consolidating the cases, the district court held a joint hearing at which it entertained both motions for injunctive relief. There, the court expressed its inclination to grant relief only on GMVP's procedural due process claim and heard argument primarily on GMVP's request for an injunction on that claim. When the district court granted the injunction, it entered the injunction onto the dockets in both cases. The district court denied the Electors' motion for an injunction but noted in its order that the Secretary remained enjoined as set forth in the GMVP case.

We consolidated both cases on appeal. The Secretary argues here that he "is especially likely to succeed on the merits of his appeal" of the injunction entered onto the docket in the Electors' case because the Electors did not raise a procedural due process claim. Mot. for Stay at 13 n.3. But based on the context in which the injunction was entered on the docket in the Electors' case, I do not read the injunction as granting the Electors any relief separate and apart from the relief granted to GMVP. I therefore reject the Secretary's argument.

11

*Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019).   In deciding whether to grant a

stay of an injunction pending appeal, the Court considers the following factors,

which mirror the factors the district court considered in entering the injunction:

> (1) whether the stay applicant has made a strong showing that it is likely
> to succeed on the merits, (2) whether the applicant will be irreparably
> injured absent a stay, (3) whether issuance of the stay will substantially
> injure the other parties interested in the proceeding, and (4) where the
> public interest lies.

*Id.* (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).   The first two factors are

the "most critical."   *Nken*, 556 U.S. at 434.   As to the first factor, "[i]t is not

enough that the chance of success on the merits be better than negligible."   *Id.*

(internal quotation marks omitted).

As to the second factor, irreparable injury, "even if [a party] establish[es] a

likelihood of success on the merits, the absence of a substantial likelihood of

irreparable injury would, standing alone, make [a stay] improper."   *Siegel v.*

*LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).[8] That is because "[a]

showing of irreparable injury is the sine qua non of injunctive relief."   *Id.* (internal

quotation marks omitted).   "[T]he asserted irreparable injury must be neither

---

[8] *Siegel* arose in the context of an appeal from the denial of a preliminary injunction, not from a motion to stay a preliminary injunction. 234 F.3d at 1168. Because we use the *Nken* factors for both inquiries, however, *Siegel* is directly applicable to this case.

12

remote nor speculative, but actual and imminent." *Id.* (internal quotation marks omitted).

On appeal we do all of this legal legwork through the lens of an abuse of discretion standard of review. *Lee*, 915 F.3d at 1317. In so doing, we review *de novo* any legal conclusions and for clear error any factual conclusions underlying the district court's exercise of its discretion. *Id.* But the weight to be afforded any given factor and the ultimate weighing of the factors together are quintessential exercises of discretion that we reverse only if that discretion is abused. *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320-21 (11th Cir. 2010); *BellSouth Telecommc'ns, Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 968-70 (11th Cir. 2005).

In determining whether the plaintiffs showed a substantial likelihood of success on the merits of the procedural due process claim, the district court was obliged to apply the framework from *Mathews v. Eldridge*, 424 U.S. 319 (1976). Under *Mathews*, a court determining what process is due in connection with a potential deprivation of a liberty or property interest must balance three considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

13

administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.   We must apply this test "to the generality of cases, not the rare exceptions."   *Id.* at 344.

## III.   DISCUSSION

In this section, I first explain why the Secretary's failure to show that he is likely to suffer irreparable harm requires that his motion for a stay be denied without regard to any of the other *Nken* factors.   Second, I respond to the Secretary's argument as to the other *Nken* factors and explain why they also do not weigh in favor of a stay pending appeal.   Third, I address my dissenting colleague's remaining concerns about the denial of the stay pending appeal.

### A. The Secretary Has Made No Strong Showing that the Injunction Would Cause Him Irreparable Injury.

Starting with irreparable injury, the Secretary argues that the district court's injunction would cause irreparable harm because the injunction prevents it "'from effectuating statutes enacted by representatives of its people,'" upsets the election process, and "risks introducing confusion, uncertainty, and inaccuracy during a general election" such that this *Nken* factor "strongly favors granting a stay." Mot. for Stay at 22-23 (quoting *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018)).   I disagree.   First, the injunction does not prevent the Secretary from effectuating any statutes because it does not negate the effects of any statutes.

14

Instead, it adds procedural protections.   Second, the Secretary has failed to substantiate any "injury following from the simple preparation on paper of a plan to carry out the [district] court's directives"—the only thing the injunction required the Secretary to do.   *See Garcia-Mir v. Meese*, 781 F.2d 1450, 1455 (11th Cir. 1986).

I might view the risk of irreparable harm differently had any other defendant moved for a stay or signaled that the injunction had in fact led to confusion, uncertainty, or inaccuracy.   But no other defendant so moved, and in fact the evidence in this case belies the Secretary's conclusory assertion that the injunction will irreparably harm the State's voting procedures.   On the same day the injunction was entered, the Secretary sent a four-page bulletin to county elections officials statewide instructing them to comply with the injunction and explaining in some detail how to do so.   The Secretary has submitted no evidence or even argument that any county has reported difficulty complying with the guidance; indeed, the Chair of the Board of Registrars of one of Georgia's most populous counties testified that compliance with the injunction as instructed by the Secretary was "pretty straightforward" and "easily doable" and would "not really add any burdens to what we are already doing."   GMVP Doc. 37-1 at 2-3.   The Chair stated he did "not believe that it will be difficult to implement the guidance . . . even with a week left until Election Day."   *Id*. at 2.

15

Our precedent makes clear that the Secretary's failure to show that the injunction would cause irreparable injury is an adequate and independent basis for denying the motion to stay pending appeal.  *See Siegel*, 234 F.3d at 1176.   In any event, because the Secretary argues that he can satisfy all of the *Nken* factors—and my dissenting colleague agrees—I discuss the remaining factors in the sections that follow.

### B. The Secretary Has Made No Strong Showing that He Is Likely to Succeed on Appeal.

The Secretary advances three arguments for why the district court abused its discretion in entering the injunction requiring state officials to provide prerejection processes to absentee ballot applicants and electors whose ballot applications and ballots suffer from perceived signature mismatches.   First, he argues that the plaintiffs' challenge does not satisfy the requirements of a facial challenge and therefore fails as a matter of law, merits aside.   Second, and relatedly, he argues that the district court erred in weighing the *Mathews* factors such that the facial challenge fails on the merits.   Third, he contends that the plaintiffs' challenge likely is barred by the doctrine of laches.   For the reasons that follow, I disagree on all three fronts.   Where the dissent's arguments are different from the Secretary's, I address those points as well.[9]

---

[9] I focus my discussion primarily on the injunction as it relates to absentee ballots, as

16

1. *The Secretary has made no strong showing that the district court likely erred in concluding that the plaintiffs could advance a facial challenge.*

The Secretary argued in the district court that GMVP's procedural due process challenge could only be construed as a facial challenge because GMVP failed to identify any absentee elector to whom the signature mismatch procedure had been unconstitutionally applied.   And, the Secretary argued, GMVP could not advance a facial challenge because it could not under any circumstances prove that Georgia's absentee election law would be "'unconstitutional in all of its applications.'"   GMVP Doc. 24 at 19 (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 (2008)).   The Secretary explained that this is because an elector who applies for an absentee ballot "weeks before the election and is immediately notified of the rejection," action "permitted if not contemplated" by the absentee ballot application statute, has not been deprived of a right without due process.   *Id.* at 19-20.   Nor, for that matter, the Secretary argued, would an elector whose absentee ballot is rejected "and who is immediately notified and provided an opportunity to cast another absentee ballot,

_____

opposed to absentee ballot applications, because neither the Secretary nor the dissent makes any argument specifically about the latter.

17

which is not subsequently rejected," suffer from deprivation of a right without due process. *Id.* at 20. The district court agreed with the Secretary that GMVP could not advance an as-applied challenge but disagreed that GMVP could not advance a facial challenge.

On appeal, the Secretary again argues that GMVP cannot advance a valid facial challenge. He reiterates the argument he made in the district court—that GMVP cannot show that Georgia's statutory procedures are constitutionally deficient "for *all* voters in *all* circumstances under which signatures are rejected." Mot. for Stay at 14.

The dissenting opinion also asserts that GMVP cannot advance a facial challenge, but for a reason further afield than the Secretary's. The dissent says that GMVP's challenge to Georgia's absentee ballot signature mismatch procedure fails as a matter of law because "countless mail-in voters' signatures are determined by election officials to match," and their votes are counted. Dissenting Op. at 50. In other words, plenty of absentee electors never suffer from a perceived signature mismatch on their absentee ballot applications or absentee ballots, so GMVP cannot show that Georgia's absentee ballot procedures are unconstitutional in all of their applications.

I take on the dissent's argument first, followed by the Secretary's. The dissent's focus on absentee electors who are unaffected by Georgia's signature

18

mismatch provisions overlooks the Supreme Court's instruction that when reviewing a facial challenge we do not consider instances in which a statute "do[es] no work." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2451 (2015). "Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894 (1992). "The proper focus of the constitutional inquiry is the group for whom the law is a *restriction*, not the group for whom the law is *irrelevant*." *Id.* (emphasis added). Georgia's signature mismatch procedures are irrelevant for those absentee electors who have no signature mismatch. Thus, I respectfully reject the dissent's argument.

The Secretary's narrower argument also fails to persuade me. The Secretary points out that an absentee elector whose ballot application or ballot is rejected for a perceived signature mismatch but who receives a rejection notice in time to try again (although there is no guarantee that he will) can either attempt to submit another absentee ballot application and/or absentee ballot (although there is no guarantee that second ballot will not be deemed another signature mismatch) or can vote in person (provided he is physically able to do so). True, but immaterial for purposes of determining whether GMVP is entitled to advance a facial challenge. That is because if Georgia's signature mismatch procedure violates the dictates of procedural due process by failing to provide adequate *pre*deprivation

19

notice and opportunity to be heard, then any *post*deprivation opportunity to take advantage of entirely different procedures does not cure the due process violation. That brings me to the merits of the procedural due process challenge, which I address in the section that follows.

2. *The Secretary has made no strong showing that the district court likely erred in weighing the* Mathews *factors.*

The Secretary challenges the weight the district court assigned each of the *Mathews* factors.   For the reasons that follow, I find no error.

a.  The Private Interest at Stake

As to the first of the *Mathews* factors, the private interest at stake, the Secretary faults the district court for defining the interest at stake—too broadly—as the fundamental right to vote.   Instead, the Secretary argues, the private interest at stake "is only the narrow interest in voting by mail," which is "modest" for most electors who could instead simply vote in person.   Mot. for Stay at 15.

As an initial matter, I disagree that the district court so broadly defined the private interest at stake. The district court determined that the private interest at stake here "*implicates* the individual's fundamental right to vote" and therefore is "substantial." GMVP Doc. 28 at 23 (emphasis added). It is undeniably true that the interest in voting absentee implicates the right to vote. Indeed, the parties

20

appear to agree that the private interest at stake is the interest in voting by mail—that is, by absentee ballot.

The Secretary's real disagreement is with the district court's determination that the interest in voting absentee is substantial.   But the Secretary has failed to meet his burden of showing that the district court likely erred. As the district court explained, that the interest in voting by absentee ballot implicates the fundamental right to vote lends it more than modest weight.   And even though the Secretary posits that an absentee elector rejected for a perceived signature mismatch may still have ample time to vote in person, he has not shown that this elector represents the "generality of cases."   *Mathews*, 424 U.S. at 344.

To the contrary, given the statutory and regulatory scheme Georgia has constructed for absentee voting, the Secretary's hypothetical likely does not cover the generality of cases.   Although any elector in Georgia may vote by absentee ballot, Georgia's Administrative Code suggests that electors applying for absentee ballots often do so because they are elderly, physically disabled, or residing temporarily or permanently outside the voting precinct on Election Day, either because of military obligations or because they have taken up residence overseas. *See* Ga. Comp. R. & Regs. 183-1-14-.01(3) (listing these categories of absentee electors along with a category for "[n]o reason is provided").   Individuals falling into these categories are likely to have difficulty appearing in person to vote.

21

Moreover, the ability to appear in person depends on receiving rejection notice in time to do so. Although Georgia's code requires that rejection notices "promptly" issue, O.C.G.A. §§ 21-2-381(b)(3), -386(a)(1)(C), there is no time frame specified. The Secretary points to nothing in the record to suggest that in the generality of cases absentee electors apply for and cast ballots early enough within the voting period such that they would benefit from a "prompt" notice, whatever that means.

In sum, the Secretary has failed to show that the district court likely erred in giving this first *Mathews* factor substantial weight.

b. The Risk of an Erroneous Deprivation

As to the second *Mathews* factor, the Secretary argues that the risk of an erroneous deprivation is small considering the relatively low percentages of absentee ballot applications and absentee ballots that were rejected for perceived signature mismatches in previous elections. And, the Secretary again stresses, rejections must be accompanied by notice, and this notice provides electors with ample time to either mail in another absentee ballot application or absentee ballot or vote in person. The Secretary's arguments, however, do nothing to refute the district court's determination that although "the risk of an erroneous deprivation is by no means enormous, permitting an absentee elector to resolve an alleged signature discrepancy nevertheless has the very tangible benefit of avoiding disenfranchisement" for that elector. GMVP Doc. 28 at 24. Because the

22

Secretary has not even argued that this determination was in error, he cannot show that the district court likely erred in finding that this second *Mathews* factor weighs in favor of GMVP.[10]

c.  The Government's Interest and Burden

As to the final *Mathews* factor, the district court found "that additional procedures would involve minimal administrative burdens while still furthering the State's" interest.  *Id.* at 26.   The Secretary disagrees, arguing that the injunction's procedures for absentee ballot applications or absentee ballots with a perceived signature mismatch impose substantial burdens on the State.   As I explain below, the Secretary's arguments do not convince me that the district court erroneously weighed this factor.

First, the Secretary takes issue with the injunction's requirement that the elector may send an attorney or attorney in fact to confirm the elector's identity. The Secretary argues that this predeprivation procedure burdens the State's undisputed substantial interest in preventing voter fraud by permitting individuals

---

[10] Further in analyzing the second *Mathews* factor, the district court explained that the "probative value of additional procedures is high" given the risk of disenfranchisement. GMVP Doc. 28 at 25. The Secretary objects that the injunction's requirements "are unlikely to add significant value to the prompt notice and generous opportunities for cure the statute already provides." Mot. for Stay at 17. For the reasons I have explained, however, for many absentee electors the cure of showing up to vote simply will not be possible or practicable.

other than the elector to confirm the elector's identity, "without any kind of oath or affidavit, merely by possessing the [elector's] identification."   Mot. for Stay at 18. This is inaccurate:   the injunction allows only "a *duly authorized* attorney or attorney in fact to present proper identification" on behalf of the elector; implicit is a requirement that the attorney or attorney in fact demonstrate that she is duly authorized.   GMVP Doc. 32 at 2 (emphasis added).   Moreover, the injunction is not a leap into wholly unfamiliar territory:   Georgia law already contemplates that someone other than the absentee elector may appear to prove the elector's identity. *See* O.C.G.A. § 21-2-381(a)(1)(B) (permitting a physically disabled elector to present absentee ballot applications via her "mother, father, grandparent, aunt, uncle, sister, brother, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, or sister-in-law of the age of 18 or over").   Thus, this aspect of the injunction's prerejection procedure does not substantially burden the State's interest in preventing voter fraud.

Second, the Secretary argues that the injunction's prerejection procedures cause administrative burdens because they "necessitate significant changes to how at least some counties track absentee ballot rejections[,] changes to the systems for tracking absentee ballot voters[,] and more."   Mot. for Stay at 18-19.   Even assuming these changes would be required, the record does not support the

24

Secretary's assertion that they would create a substantial burden.   In fact, as I explained above in Part III.A., the evidence is to the contrary:   by election officials' own reports, the injunction has caused little disruption.   The Secretary therefore has failed to persuade me as to administrative burdens.

Third, the Secretary argues that the injunction's prerejection right of appeal imposes other burdens, specifically, on county elections officials "who will have to appear and defend their rejection decisions, including on an expedited basis prior to certification of the election" and on state courts who now must hear "this new class of appeals on an expedited basis."   Mot. for Stay at 19.   In addition, the Secretary says, the injunction's prerejection procedures inject the new burden of requiring a system for recertification of election results if absentee ballots tied up in any unresolved appeals would change the outcome of the election—a system the Secretary says does not currently exist.   Again, the Secretary has failed to meet his burden.   As explained in Part I.A., these procedures are already statutorily in place for absentee ballot application and absentee ballot defects other than signature mismatches.   Contrary to the Secretary's suggestion, the injunction does not require the creation of a new system, nor does it newly obligate county elections officials or state courts to adjudicate disputes relating to the rejection of absentee ballots.

25

The burden on these entities may increase to some limited extent because of this new class of ballot applications and ballots to which prerejection procedures apply, but by the Secretary's own calculation the number of perceived signature mismatches is quite low.   And by the Secretary's own admission, some of the prerejection procedures are unlikely to be used frequently.   *See* Mot. for Stay at 18 ("[I]t is hard to see what additional work the . . . right of appeal could do in any given case; either the voter will provide identification in the pre-rejection opportunity to resolve the alleged signature deficiency, or the voter will not . . . ." (internal quotation marks omitted)).   For these reasons, I reject the Secretary's argument that the third *Mathews* factor should weigh in his favor and that the district court likely erred in concluding otherwise.[11]

---

[11] Also for these reasons, I disagree with the dissent that the injunction violates principles of federalism by requiring counties in Georgia to "to craft ad hoc administrative tribunals" and by requiring state courts to hear appeals from these tribunals. Dissenting Op. at 55.  The hearings the district court's injunction contemplates already take place in Georgia, and the state superior courts already hear appeals from the results of these hearings, where they are necessary.

The dissent opines that the injunction provides a poor remedy for absentee electors with perceived signature mismatches and that a state-law procedural due process claim in superior court would be just that—superior—but the dissent's characterization of the process the injunction contemplates is inaccurate. The dissent argues that first the "voter must wait to see whether he or she receives rejection notice." *Id.*  True, but given the injunction's requirement that the notice be sent by first-class mail and electronic means, this wait should not be onerous. And in any event, an elector also would have to await a rejection notice before going straight to the superior court to file a lawsuit. Second, the dissent says, the "voter must then respond to the notice," and "the [injunction] does not tell us the means of responding or the timeframe for doing so." *Id.*  This is simply not true.   As to the means of responding, the injunction provides that the elector must respond by providing identification in accordance with O.C.G.A. §§ 21-2-417 and -417.7 and that the elector may "send or rely upon a duly authorized attorney or attorney in fact to present proper identification," GMVP Doc. 32 at 2.  As

26

\*      \*      \*

In conclusion, the Secretary has failed to show that the district court likely erred in determining the weight of any single *Mathews* factor.   And when I examine all of the factors together, I cannot say that the district court likely erred in weighing them.   Thus, the Secretary has failed to make a strong showing that he is likely to succeed on the merits of his appeal.

3. *The Secretary has made no strong showing that he is likely to succeed on the merits of his laches argument.*

In the alternative to his main merits argument, the Secretary argues that we should stay the district court's injunction because the equitable doctrine of laches likely bars the plaintiffs' procedural due process challenge. To succeed on a

---

to the timeframe for responding, the injunction expressly requires that the elector's response "shall be done prior to the certification" of the election returns. *Id.* at 2-3 (citing O.C.G.A. § 21-2-230(g)). Third, the dissent asserts, "[i]f the voter challenges the election official's signature determination, he or she attends a hearing held by an unknown adjudicator." Dissenting Op. at 55. Again, this is inaccurate. The injunction expressly cites to O.C.G.A. § 21-2-230(g), which provides that the adjudicator in such a dispute is "the [county] board of registrars." Fourth, the dissent says that if the adjudicator upholds the signature mismatch determination, then the elector can appeal the decision to the superior court. Yes, according to procedures already delineated in O.C.G.A. § 21-2-229(e). And although the dissent suggests that all of these steps are inevitable, I disagree. In all likelihood, most electors will never file a lawsuit in the superior court, or even seek a hearing before the board of registrars, because earlier steps in the predeprivation process will vindicate their rights. *See* Mot. for Stay at 18 (the Secretary arguing that "it is hard to see what additional work" the right to appeal will do in light of the injunction's other prerejection procedures). For this reason, I am unconvinced that an elector's filing a procedural due process claim directly in the superior court is a superior process to the one the district court ordered. And, of course, where state law is found to violate the federal Constitution, the district court is empowered to remedy that violation without regard to whether a different—even superior— remedy exists under the State's constitution.

27

laches claim, the Secretary must show that the plaintiffs inexcusably delayed bringing their procedural due process claim and that the delay caused undue prejudice.   *Lee*, 915 F.3d at 1326; *see United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005).[12]  He cannot at this stage do so.    As the district court explained, it is undisputed that events of the 2018 election cycle sparked their action:   for GMVP specifically, it was an October news report on increased rates of rejection of absentee ballot applications and absentee ballots in Gwinnett County due to perceived signature mismatches.[13] Moreover, the Secretary does not contest that laches is generally a factual question that requires factual development—something that is lacking at the early stage of this case.   In light of the plaintiffs' allegations and the early stage of this litigation, I cannot say it is likely that the Secretary will be able to prove inexcusable delay merely because Georgia's absentee voting statutes have been on the books for several years.

Nor is the Secretary likely to establish undue prejudice.   As explained in detail above, the record in this case shows that the injunction caused and was

---

[12] "When the district court has weighed the proper factors in determining whether a defendant has proven the elements of laches, we review the district court's decision for abuse of discretion." *Angel Flight of Ga., Inc. v. Angel Flight Am. Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008). I apply this standard of review here because the Secretary does not argue that the district court weighed improper factors.

[13] As for the Electors, they say it was the surge in litigation over the reliability of Georgia's in-person voting system and corresponding increase in absentee voting, which was seen as more dependable.

expected to cause little if any disruption to those tasked with administering the 2018 election.

Thus, on this record, the Secretary cannot make a strong showing that he is likely to succeed on the merits of his laches argument.

## C. The Remaining *Nken* Factors Counsel Against a Stay of the District Court's Preliminary Injunction.

As with the first and second factors, the remaining *Nken* factors— whether the stay will substantially injure other interested parties and the public interest—do not militate in favor of granting a stay of the injunction.   "A stay would disenfranchise many eligible electors whose ballots were rejected" for a perceived signature mismatch even when they were eligible to vote.   *Lee*, 915 F.3d at 1327.   "And public knowledge that legitimate votes were not counted due to no fault of the voters"—and with no prerejection notice to the voters that their votes would not be counted and no opportunity to rectify that situation—"would be harmful to the public's perception of the election's legitimacy."   *Id.*   It is beyond dispute that "protecting public confidence in elections is deeply important—indeed, critical—to democracy."   *Id.* (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (plurality opinion)).   Thus, the remaining *Nken* factors do not favor granting a stay.

In sum, the Secretary has failed to make the requisite showing to justify a stay of the district court's injunction. Before I conclude, I address some of the points in my colleague's dissent.

**D. Neither the *Parratt* Doctrine, nor Principles of Federalism and Separation of Powers, nor the Equal Protection Clause Justifies a Stay of the Injunction.**

Aside from those points I have already addressed, the dissent makes at least three additional arguments for why we should stay the district court's injunction pending appeal.   None of these arguments, taken individually or collectively, convinces me.

*1.  The "*Parratt *Doctrine" does not doom GMVP's due process claim.*

In addition to challenging the district court's conclusion that GMVP was entitled to advance a facial due process challenge, the dissent argues that GMVP's claim fails under the so-called "*Parratt* doctrine."   Dissenting Op. at 49, 51-54.  In *Parratt v. Taylor*, 451 U.S. 527 (1981), as in a related case, *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court held that when a state official was "not acting pursuant to any established state procedure," but rather was engaging in a "random, unauthorized" act, the State is in no position to provide predeprivation process, and postdeprivation process is all that is due.   *Zinermon v. Burch*, 494

30

U.S. 113, 130 (1990).    *Parratt* does not bar GMVP's claim for predeprivation process in this case for two related reasons.[14]

First, to my knowledge we have never applied *Parratt* to a facial procedural due process challenge to an existing statutory or administrative scheme, and there is good reason not to, at least in this context.    Indeed, my dissenting colleague appears not to disagree:    he invokes *Parratt* only after opining (incorrectly, I think) that GMVP's claim can only be construed as an as-applied claim.    In *Parratt*, *Hudson*, and their progeny, *see, e.g.*, *McKinney v. Pate*, 20 F.3d 1550, 1562-63 (11th Cir. 1994) (en banc), the state actor whose actions were challenged was acting contrary to established state customs or policies.    In *Parratt*, a prison employee allegedly negligently mishandled an inmate's property.    *Parratt*, 451 U.S. at 530.[15] In *Hudson*, a prison employee allegedly maliciously destroyed inmate property because of a "personal vendetta."    *Zinermon*, 494 U.S. at 129-30 (citing *Hudson*, 548 U.S. at 521).    In *McKinney*, members of a county Board of Commissioners allegedly were biased against the plaintiff.    *McKinney*, 20 F.3d at 1554; *see id.* at 1563 ("As any bias on the part of the Board was not sanctioned by

---

[14] There is a third potential reason: the Secretary has not argued in his motion for a stay pending appeal that *Parratt* applies. *See Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 680 (11th Cir. 2014) (explaining that arguments not advanced by an appellant are deemed abandoned).

[15] The Supreme Court subsequently held that a state actor is not liable under § 1983 for negligent conduct. *See Daniels v. Williams*, 474 U.S. 327, 336 (1986).

the state and was the product of the intentional acts of the commissioners, under *Parratt,* only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation."). Here, the state actor whose actions are challenged—the Secretary—is not alleged to have acted contrary to Georgia's customs or policies.   Rather, he is alleged to have followed them.   *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982) (explaining that *Parratt* is inapplicable when "it is the state system itself that destroys a complainant's property interest, by operation of law").

Second, and relatedly, I disagree with the dissent's characterization of signature mismatch determinations as "'random and unauthorized act[s] by a state employee.'"   Dissenting Op. at 51 (quoting *Parratt*, 451 U.S. at 539).   The Supreme Court expressly has stated that *Parratt* does not apply where the state actor—here, the Secretary—"delegated to [its employees] the power and authority to effect the" alleged deprivation and the "concomitant duty to initiate the [state-law] procedural safeguards."   *Zinermon*, 494 U.S. at 138.   These are precisely the circumstances here.   The Secretary has delegated to the county elections officials reviewing absentee ballot application and absentee ballot signatures the power and authority to reject, without predeprivation procedures, perceived signature mismatches.   In so doing, the elections officials, rather than engaging in random and unauthorized acts, are following procedures established and authorized by

32

Georgia law—that is, comparing signatures on absentee ballot applications and absentee ballots to the signatures on electors' voter registration cards.    O.C.G.A. § 21-2-381(b)(1) (absentee ballot applications), *id.* §§ 21-2-384(b), (c), - 386(a)(1)(B), (C) (absentee ballots).    Those same elections officials initiate the postdeprivation processes in place for rejecting absentee ballot applications and absentee ballots and providing instructions on how to vote despite the rejection. Thus, "[u]nlike in *Parratt* and *Hudson*, this case does not represent the special instance of the *Mathews* due process analysis where postdeprivation process is all that is due because no predeprivation safeguards would be of use in preventing the kind of deprivation alleged."    *Zinermon*, 494 U.S. at 139.

For these reasons, I cannot agree that *Parratt* applies to this case or in any way bars GMVP from obtaining relief.

### 2. *The injunction does not violate principles of federalism or separation of powers.*

The dissent argues that the district court violated the Constitution's core principle of federalism by ordering an injunction that "inserted a new provision into the [Georgia] Code."    Dissenting Op. at 57.    The dissent describes this "new statutory provision"—the contents of the injunction—as an "egregious[ ] . . . overreach."    *Id.* at 15-16.    Comparing the lack of statutory prerejection procedures for perceived signature mismatches against statutory procedures for

33

challenges to electors' eligibility to remain on a county's list of electors, the dissent makes two points:   the district court contravened the will of the Georgia legislature by adding a procedural requirement and "the legislature deliberately omitted the [district court's procedural requirement] because it would be impossible to implement."   *Id.* at 17.

As to the dissent's first argument, "while federalism certainly respects states' rights, it also demands the supremacy of federal law when state law officials offend federally protected rights."   *Lee*, 915 F.3d at 1331.   If the district court finds that the State likely has failed to protect the federal right to due process, then it is the district court's prerogative to grant relief even if the Georgia legislature did not contemplate the remedy.   And, as I have explained, rather than cutting an entirely new scheme from whole cloth, the district court's injunction borrowed heavily from the processes already in place for other absentee ballot application and absentee ballot defects.   *See* GMVP Doc. 32 at 2-3 (incorporating procedural protections set forth in O.C.G.A. §§ 21-2-230, -384, -417, -419).[16] Although the

---

[16] The dissent cites two additional statutes—O.C.G.A. § 21-2-228 and O.C.G.A. § 21-2-229—to illustrate how Georgia can legislate intricate procedures for administrative adjudication and judicial review of voting processes when it wants to and that the legislature simply had no will to do so here. Aside from the fact that the legislature's will must bend to the dictates of due process, these two statutes are poor comparators for the procedures sought and ordered here. Challenges to elector eligibility under these two statutes can be made at any time because they concern the right of an elector to remain on the county's list of eligible electors. For that reason, the processes set forth in those statutes are more intricate and contemplate more thorough, time-consuming review. The district court's injunction incorporated nothing of O.C.G.A. § 21-2-

federalism and separation-of-powers implications of any federal court's injunction against state procedures is significant, narrow relief like that granted here does not so offend these principles as to violate the Constitution. *See generally Goldberg v. Kelly*, 397 U.S. 254 (1970) (mandating narrow reforms to a state agency's procedure that lacked adequate procedural due process protections).   Indeed, "rather than undermining [Georgia's] sovereignty, the preliminary injunction's solution actually respected it" by borrowing from existing statutory procedures relating to absentee ballot applications and absentee ballots.   *Lee*, 915 F.3d at 1331.

As to the dissent's second argument, the record in this case suggests that the procedural protections the district court ordered not only are possible to implement, but in fact are rather simple to do.   *See* GMVP Doc. 37-1 (Chair of the Chatham County Board of Registrars' testimony that compliance with the injunction was "pretty straightforward" and "easily doable" and that he did "not

_____

228. And it incorporated O.C.G.A. § 21-2-229 only insofar as one subsection of that statute—subsection (e) permitting judicial review of the administrative decision—is expressly incorporated into O.C.G.A. § 21-2-230. Section 230, from which the injunction rather heavily borrowed, *see supra* at 9-10, 26-27 n.11, covers challenges to elector eligibility advanced much closer to the date of an election. *See* O.C.G.A. § 21-2-230(a) ("Such challenge may be made at any time prior to the elector whose right to vote is being challenged voting at the elector's polling place or, if such elector cast an absentee ballot, prior to 5:00 P.M. on the day before the election"). This statutory scheme shows that the legislature also contemplated a more hurried predeprivation review process for challenges occurring closer in time to an election (as would be the case for perceived signature mismatches).

believe that it will be difficult to implement the guidance . . . even with a week left until Election Day"). Further, the existence of O.C.G.A. § 21-2-230, which governs challenges that occur once voting has begun and from which the injunction here borrowed several procedures, demonstrates that the procedural protections the district court ordered *are* possible to implement. The dissent downplays the relevance of § 230 by saying that "the volume of challenges under that section pales in comparison to the volume of signature reviews at issue here." Dissenting Op. at 60 n.32. This statement is unsubstantiated by any data, though, and the data we do have in the record does not indicate that the individual county registrars' offices would be burdened with herculean tasks. For example, of the 524 absentee ballots Gwinnett County had rejected as of October 18, 2018, only 9 were due to perceived signature mismatches.

I therefore disagree with the dissent that the injunction offends principles of federalism and separation of powers.[17]

*3. The injunction does not violate the Equal Protection Clause.*

---

[17] The dissent makes a third argument for why the district court's injunction violates these principles, saying the injunction is a re-writing of Georgia's code and that the district court had no authority to do. My colleague made a nearly identical argument in a recent case, *see Lee*, 915 F.3d at 1347-48 (Tjoflat, J., dissenting). I disagree with his reasoning here for the same reasons the majority in *Lee* rejected his argument there. *See id.* at 1331 (majority opinion).

36

Finally, the dissent argues that the injunction violates the Equal Protection Clause.   The dissent complains that the injunction left unfilled a number of details, including whether the board of registrars at the administrative hearing owes any deference to the clerk who perceived the signature mismatch and, if so, under what standard that decision is reviewed; whether and what evidence is admissible; whether and how discovery may proceed; and who bears the burden of proof and what is that burden.   And, the dissent says, the injunction violates equal protection because it "leaves election officials to fill in the details" of the prerejection notice and opportunity to be heard with a requirement "only that they do so 'in good faith.'"   Dissenting Op. at 65 (quoting GMVP Doc. 32 at 2).   Specifically, the dissent says that the injunction runs afoul of the principle that "'[w]hen a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.'"   *Id.* (quoting *Bush v. Gore*, 531 U.S. 98, 109 (2000)).

As an initial matter, I disagree that the injunction leaves unanswered each of the questions the dissent poses.   The injunction answers the questions of what evidence is admissible and who bears the burden of proof by its explicit reference to O.C.G.A. § 21-2-417.   That statute provides that "each elector shall present proper identification to a poll worker"—placing the burden of proof on the elector—by presenting any of a list of identifying documents—the type of

37

evidence that would be admissible.    By its reference to O.C.G.A. § 21-2-230, the injunction suggests that the board of registrars would owe no more deference to the official who identified a possible signature mismatch than the board would owe if it had probable cause to believe an elector was not eligible to remain on a voting list.    *See* O.C.G.A. § 21-2-230(b), (e).    The injunction thus is not so standardless as to offend the Constitution.

Moreover, I disagree that ordering county officials to act in "good faith" leaves us without any assurance that equal protection will be provided.    Given that the injunction provides cogent standards for prerejection process, requiring county officials to act in "good faith" does not make it likely that counties will engage in such vastly different practices that those practices will run afoul of equal protection principles.    Indeed, county officials already are tasked with acting in good faith to determine the eligibility of an elector who submits a provisional ballot.    *See* O.C.G.A. § 21-2-419(b) ("The board of registrars shall immediately examine the information contained on [the elector's provisional ballot] and make a *good faith* effort to determine whether the person casting the provisional ballot was entitled to vote in the primary or election." (emphasis added)).    As with that process, given

the procedural parameters for making such a determination, I do not view the

requirement here that officials act in "good faith" as constitutionally infirm.[18]

Finally, I note that the Secretary has not argued that the injunction violates

the Equal Protection Clause.   He cannot satisfy his burden to show that he is

entitled to a stay pending appeal if he does not make an argument, even a

meritorious one.   I therefore respectfully disagree with the dissent that we should

grant a stay on equal protection grounds.

## IV.   CONCLUSION

The task of a federal Court of Appeals in reviewing a district court's

preliminary injunction is a narrow one:   it must decide only whether the district

court abused its discretion.   In this case, the district court exercised its discretion

narrowly, hewing largely to preexisting state law and procedures in analogous

contexts to afford affected absentee electors a narrow form of relief.   The

Secretary's arguments on appeal have failed to convince me that the district court's

careful exercise of its discretion to provide this limited form of relief is so

---

[18] The dissent also says that in contrast to the injunction, O.C.G.A. §§ 21-2-228, 229, and 230 "each . . . answers the questions" the dissent poses, Dissenting Op. at 66, but that is untrue for the closest analogue to the signature mismatches at issue, § 230. Section 230 no more answers these questions than does the district court's injunction. But, for the same reasons the prerejection procedures in the district court's injunction pass muster, § 230's procedures comply with the dictates of equal protection.

egregious that this Court must overturn it. It is for these reasons that I voted to deny the Secretary's motion for a stay.

NEWSOM, J., CIRCUIT JUDGE, concurring in the judgment:

On November 2, 2018, I voted to deny then-Secretary Kemp's motion to stay the district court's injunction on the ground that he had not made the requisite showing under *Nken v. Holder*, 556 U.S. 418 (2009).   I write separately today only to emphasize my belief that our November 2 order refusing the stay says all that needs to be said.

On November 2, we had before us a live "case or controversy," to be sure. The November 2018 election was fast approaching, the district court had entered an injunction to which Kemp objected, and Kemp had filed an appeal and, with it, a motion to stay.   We denied the stay, the election went forward, Kemp was elected Governor, and the Office of the Secretary of State has since voluntarily dismissed its appeal of the district court's injunction.   So while our November 2 decision was not the least bit "advisory," it seems to me that everything we say today—more than four months after the fact and with so much water under the bridge—is.   In my judgment, we should not now opine on issues in a case that, though once live, is now doubly (if not triply) moot—particularly given that nothing we can say at this point could even theoretically provide Kemp the relief he once sought.   *Cf. Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015) ("We cannot turn back the clock and create a world in which the County does not have to administer the 2014 election under the strictures of the injunction."); *Stone*

41

*v. Bd. of Election Comm'rs for City of Chicago*, 643 F.3d 543, 544–45 (7th Cir. 2011) (holding that an appeal of the decision to deny a preliminary injunction was moot "[b]ecause the election has taken place").

TJOFLAT, Circuit Judge, dissenting:

This conflict centers on absentee voting under Georgia law.   On October 25, 2018, the United States District Court for the Northern District of Georgia—in an effort to ensure that all absentee ballots for the general election would be counted—entered a preliminary injunction that effectively rewrote Georgia's election code.   Georgia's Secretary of State ("the Secretary") moved in this Court for a stay of the injunction pending appeal.   We denied the Motion; I dissented, noting that an opinion would follow.   I now explain my reasons for dissenting.

## I.

## A.

Georgia permits registered voters to vote in person on Election Day, in person early, or by mail.   Ga. Code Ann. §§ 21-2-380 to -381.[19] This case concerns the last method—voting by mail—the details of which are set out in Sections 21-2-381 and -386 of Georgia's election code ("the Statutes").

To receive a mail-in ballot, a voter must first submit an application for a mail-in ballot.   *Id.* § 21-2-381.   When an application is received, the registrar or absentee ballot clerk shall "compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter

---

[19] Georgia's election code collectively refers to all voting that occurs before Election Day, whether in person or by mail, as "absentee voting."

registration card." *Id.* § 21-2-381(b)(1).   If the voter is found to be eligible, a

ballot is mailed out within three business days.   *Id.* § 21-2-381(b)(2)(A); Ga.

Comp. R. & Regs. 183-1-14-.11.   But if the voter is found to be ineligible, the

registrar or clerk shall "deny the application by writing the reason for rejection in

the proper space on the application and shall promptly notify the applicant in

writing of the ground of ineligibility."   *Id.* § 21-2-381(b)(3).

The registrar or absentee ballot clerk follows a similar process for mail-in

ballots themselves.   When a mail-in ballot is received, the registrar or clerk shall

> compare the signature or mark on the oath with the signature or mark
> on the absentee elector's voter registration card or the most recent
> update to such absentee elector's voter registration card and
> application for absentee ballot or a facsimile of said signature or mark
> taken from said card or application.

*Id.* § 21-2-386(a)(1)(B).   If the signature appears to be valid, and other

information appears to be correct, the ballot is certified.   *Id.*   If the signature

appears to be invalid, however, the registrar or clerk "shall promptly notify the

elector of such rejection."   *Id.* § 21-2-386(a)(1)(C).

A voter whose signature is determined to be invalid receives process in the

form of notice, *id.* §§ 21-2-381(b)(3), -386(a)(1)(C), as well as the "opportunity to

vote in the primary, election, or runoff either by applying for a second absentee

ballot prior to the day before such primary, election, or runoff or by voting in

person at the elector's polling place on the day of the primary, election, or runoff,"

44

Ga. Comp. R. & Regs. 183-1-14-.09(2).[20]

Plaintiffs to this suit, Betty J. Jones, a registered voter in Georgia, and various advocacy groups, allege that the process set out in the Statutes is constitutionally defective.[21] The mail-in voting scheme is a facial violation of procedural due process, they argue, because the Statutes do not set out any manner and method for appealing a determination that the signature on a mailed-in application or ballot is invalid—that is, that it fails to match the signature on record.

The District Court agreed and held that Plaintiffs were substantially likely to succeed on the merits of their procedural due process claim.   The Court reasoned that Plaintiffs have a liberty interest in voting by mail-in ballot and that the balance of interests under *Matthews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1976), the test to determine what process is due in any situation, required Defendants to provide notice and an opportunity to be heard before voters are first denied the

_____

[20] A voter who votes in person, whether on Election Day or before Election Day, is verified by identification, not by signature. Ga. Code. Ann. § 21-2-417.

[21] A bit more about Plaintiffs:

Ms. Jones suffers from "circulation problems that make it very difficult for her to stand in long lines or walk and to vote in-person." She submitted a mail-in ballot application in September 2018 that was rejected due to a signature mismatch. She then submitted additional forms, but as of one week before Election Day, she had yet to receive an absentee ballot.

The advocacy groups are the Georgia Muslim Voter Project and Asian-Americans Advancing Justice-Atlanta.

45

opportunity to vote by mail-in ballot.

The District Court enjoined the Secretary to order election officials in Georgia's 159 counties to provide pre-rejection notice, to set up ad hoc administrative tribunals to adjudicate signature disputes, and to allow an attorney to stand in for voters at those proceedings.   The Court also vested Georgia's superior courts, the state's trial courts of general jurisdiction, Ga. Const. art. VI, § 4, para. 1, with appellate jurisdiction over the tribunals:

> The county elections official shall . . . provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter.   This process shall be done in good faith and is limited to confirming the identity of the absentee voter consistent with existing voter identification laws.   The elections official is required to send rejection notice via first-class mail and also electronic means, as available or as otherwise required by law.   This process shall include allowing the absentee voter to send or rely upon a duly authorized attorney or attorney in fact to present proper identification. . . .   The absentee voter shall have the right to appeal any absentee ballot rejection following the outcome of the aforementioned process, as designated in [Ga. Code Ann.] § 21-2-229(e).

*Ga. Muslim Voter Project v. Kemp*, No. 1:18-cv-04776-LMM, slip op. at 2 (N.D. Ga. Oct. 25, 2018) (temporary restraining order) (citations omitted).

The Court also required, for mail-in ballot applications, that election officials provide voters with provisional ballots:

> [F]or all ballot applications where a signature mismatch is perceived, the county elections official shall . . . provide a provisional absentee ballot to the absentee voter along with information as to the process that will be followed in reviewing the provisional ballot. . . .   Once

46

> any provisional ballot is received, the procedure outlined in section 1
> above is to be followed.

*Id.* at 3.    A provisional ballot is a ballot issued to a voter who is unable to produce a type of statutorily enumerated identification at the polling place but who nonetheless "swear[s] or affirm[s] that the elector is the person identified in the elector's voter certificate."    *See* Ga. Code Ann. § 21-2-417(b).    The ballot is counted only if officials verify the voter's identification within the statutory timeframe.    *Id.*

The Secretary moved in this Court under Federal Rule of Appellate Procedure 8 for a stay of the injunction pending appeal and in the alternative, for expedited appeal, both of which the majority denied.[22] *Ga. Muslim Voter Project v. Kemp*, No. 18-14502-GG, slip op. at 2 (11th Cir. Nov. 2, 2018).    The majority believed that the Secretary had not made the requisite showing under *Nken v.*

---

[22] This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear the motions.  Under an exception to the final-judgment rule, we have authority to review a district court's grant of injunctions. 28 U.S.C. § 1291(a)(1). Though the District Court entered a temporary restraining order ("TRO") under Federal Rule of Civil Procedure 65(b), not a preliminary injunction under Rule 65(a), the "label placed upon the order is not necessarily dispositive of its appealability." *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1314 (11th Cir. 2004) (citation omitted). We treat a TRO as an injunction when "(1) the duration of the relief sought or granted exceeds that allowed by a TRO (ten days), (2) the notice and hearing sought or afforded suggest that the relief sought was a preliminary injunction, and (3) the requested relief seeks to change the status quo." *Id.* (citations omitted).

The TRO here is properly classified as a preliminary injunction because the TRO has no expiration, because the parties filed motions and the District Court held an evidentiary hearing, and because the relief requires the Secretary to take new action.

*Holder*, 556 U.S. 418, 129 S. Ct. 1749 (2009), which outlines the factors for determining whether a stay pending appeal is warranted.[23]  *Id.*    The panel also invoked its authority under Federal Rule of Appellate Procedure 3(b)(2) to consolidate this case and a related case, *Martin v. Kemp*.   *Ga. Muslim Voter Project*, slip op. at 2 (11th Cir. Nov. 2, 2018).

### B.

The District Court committed three errors, each of which reveals that the Secretary makes a "strong showing that he is likely to succeed on the merits" and that the "public interest lies" with granting the stay.   *See Nken*, 556 U.S. at 434, 129 S. Ct. at 1761.

In Part II, I explain that Plaintiffs' claim must rise or fall as a facial challenge because, as the District Court observed, "Plaintiffs have not identified a voter to whom [the Statutes] have been unconstitutionally applied."   *Ga. Muslim Voter Project*, slip op. at 19 (N.D. Ga. Oct. 24, 2018) (order granting temporary restraining order).   But Plaintiffs have not met their burden—under precedent of

---

[23] In deciding whether the Court should grant a stay pending appeal, the factors are

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434, 129 S. Ct. at 1761 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S. Ct. 2113, 2119 (1987)).

both this Court and the Supreme Court—of showing that the Statutes are unconstitutional in all of their applications.

In Part III, I explain that even if I were to construe Plaintiffs' claim as an as-applied procedural due process challenge, their claim would still fail because—under the *Parratt* doctrine, as expounded by this Court in *McKinney*—the deprivations are random and unauthorized acts.[24] Because Georgia provides a constitutionally adequate remedy, the law requires Plaintiffs to seek relief in Georgia superior court, not here.

And in Part IV, I explain that even if I could conceive of a situation in which Georgia afforded Plaintiffs no remedy, the District Court's remedy—which takes a hacksaw to Georgia's election code—is unconstitutional because it violates the doctrine of federalism and the Equal Protection Clause.   A federal court faced with a facially unconstitutional state statute has but one remedy: strike down the statute *in toto*.   Applied here, that remedy would be to enjoin enforcement of Georgia's entire mail-in voting scheme.   The Court's remedy here is particularly abusive not only because it modifies the scheme, thus allowing it to stand, but because it allows the scheme to vary from county to county.

---

[24] The cases are *Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662 (1986), and *McKinney v. Pate*, 20 F.3d 1550 (1994) (en banc).

49

II.

As an initial matter, Plaintiffs have no viable facial challenge to the Statutes.

In Plaintiffs' view, the "opportunity to be heard is—or is not—provided by the statute on its face." *Ga. Muslim Voter Project*, slip op. at 21 (N.D. Ga. Oct. 24, 2018) (order granting temporary restraining order).   As such, they must show that "no set of circumstances exists under which the law would be valid." *J.R. v. Hansen*, 803 F.3d 1315, 1320 (11th Cir. 2015) (alteration omitted) (quoting *Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir. 2001)); *see also GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012) (requiring that, as to a facial challenge, a statute be "unconstitutional in all applications" (citing *United States v. Salerno*, 481 U.S. 739, 107 S. Ct. 2095 (1987))).   To succeed on their procedural due process challenge, Plaintiffs must identify a liberty interest that is burdened.   Putting these two concepts together, then, Plaintiffs must show that the identifiable liberty interest is burdened in all of the law's applications.

For scores of Georgia's mail-in voters, however, the Statutes *are* valid.   The District Court determined that Plaintiffs have a "right to apply for and vote via absentee ballot." *Ga. Muslim Voter Project*, slip op. at 22 (N.D. Ga. Oct. 24, 2018) (order granting temporary restraining order).   But countless mail-in voters' signatures are determined by election officials to match.   These voters

50

successfully apply for mail-in ballots and, when they return those ballots, successfully have their votes counted.   For these voters, then, the right to apply for and vote via mail-in ballot is not burdened at all.   For this reason alone, Plaintiffs' facial challenge to the Statutes fails as a matter of law.

III.

Even construed as an as-applied challenge, Plaintiffs' procedural due process claim still fails.

The state may not "deprive any person of life, liberty, or property[] without due process of law."   U.S. Const. amend. XIV, § 1.   A violation of procedural due process requires "(1) a deprivation of a constitutionally[] protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Hansen*, 803 F.3d at 1320 (alteration omitted) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).   My focus is on the third element alone—the process due.

The Supreme Court in *Parratt v. Taylor* told us what process is due in cases when, as here, we face the "impracticality of providing any meaningful predeprivation process," given a "random and unauthorized act by a state employee."   *Parratt*, 451 U.S. at 539, 541, 101 S. Ct. at 1915, 1916.   In such situations, "postdeprivation tort remedies are all the process that is due, simply

51

because they are the only remedies the State could be expected to provide."[25]

*Zinermon*, 494 U.S. at 128, 110 S. Ct. at 985.   The only relevant question once we

determine that *Parratt* applies is whether the state's post-deprivation remedies are

constitutionally adequate.   *Cf. McKinney*, 20 F.3d at 1562 (observing that

"procedural due process violations do not become complete 'unless and until the

state refuses to provide due process'" (quoting *Zinermon*, 494 U.S. at 123, 110 S.

Ct. at 983)).

I explain below that this case is a textbook application of *Parratt* and that

Georgia provides a constitutionally adequate remedy.   I also explain that the

remedy in state court more effectively and efficiently resolves Plaintiffs' grievance

than does the District Court's solution.

A.

This case falls squarely within *Parratt* because it would be impracticable for

Georgia to provide additional pre-deprivation procedures.   *Cf. Fetner v. City of

Roanoke*, 813 F.2d 1183, 1185–86 (11th Cir. 1987) ("The touchstone in *Parratt*

was the impracticability of holding a hearing prior to the claimed deprivation."

---

[25] The Court explained that "*Parratt* is not an exception to the *Mathews* balancing test, but rather an application of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Zinermon v. Burch*, 494 U.S. 113, 129, 110 S. Ct. 975, 985 (1990).

52

(citing *Parratt*, 451 U.S. at 539–41, 101 S. Ct. at 1914–16)).

To state the obvious, the Statutes do not authorize election officials to deprive eligible voters of the right to apply for and to vote by mail-in ballot. Indeed, the very fact that the Secretary would remove election officials shown to perform erroneous signature reviews reveals that election officials "lack[] the state-clothed authority to deprive persons of constitutionally protected interests." *See Burch v. Apalachee Cmty. Mental Health Servs., Inc.*, 840 F.2d 797, 801 n.9 (11th Cir. 1988) (en banc) (emphasis omitted), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113, 110 S. Ct. 975 (1990); *see also Dykes v. Hosemann*, 776 F.2d 942, 952 (11th Cir. 1985) (Tjoflat, J., concurring in part and dissenting in part) (reasoning that state officials lack such authority when the state subjects them to consequences for wrongdoing).

I have no doubt, of course, that election officials make erroneous determinations. But the relevant question under *Parratt* is whether it is *practicable* for the state to do more. The volume of signatures at issue in this case provides a ready answer to that question. As of November 2, 2018, 184,925 mail-in ballots had been returned statewide.[26] And another 85,398 were still

---

[26] Ga. Sec'y of State, *Election Update* 1 (Nov. 2, 2018), http://sos.ga.gov/admin/uploads/ABSENTEE_TURNOUT_REPORT_11-2-181.pdf.

outstanding.[27]   That's 270,323 ballots.    Recall, too, that a mail-in ballot does not issue before an application, which also requires a signature review.   Ga. Code Ann. § 21-2-381.   In short, Georgia's election officials were in for 540,646 signature reviews this past election cycle.   It is simply not practicable to provide pre-deprivation notice and an opportunity to be heard when so many signature reviews are at issue.

B.

Plaintiffs have a remedy; it just isn't a federal one.

Georgia superior courts, the state's courts of general jurisdiction, provide Plaintiffs a forum in which to sue the election officials.   *See* Ga. Const. art. VI, § 4, ¶ 1 ("The superior courts shall have jurisdiction in all cases, except as otherwise provided in this Constitution.").   Plaintiffs, moreover, have a procedural due process claim under the state constitution, which prohibits the deprivation of "life, liberty, or property except by due process of law," *id.* art. I, § 1, para. 1, and which confers a private right of action, *see, e.g.*, *Atlanta Taxicab Co. Owners Ass'n v. City of Atlanta*, 638 S.E.2d 307, 314 (Ga. 2006). In short, I have no doubt that a suit in state court would make Plaintiffs whole—in other words, that they would be able to vote by mail-in ballot.[28]

---

[27] Ga. Sec'y of State, *supra* note 26, at 1.

[28] To entertain Plaintiffs' procedural due process claim, the District Court must have

54

When, as here, it is impracticable for a state like Georgia to provide pre-deprivation process for erroneous signature reviews because the state must conduct over half a million reviews in short order, a post-deprivation suit against election officials in state court is a constitutionally sufficient remedy.

## C.

What the majority fails to realize is not just that a remedy in Georgia superior court is sufficient but that it is also superior.

The District Court orders election officials to craft ad hoc administrative tribunals and vests Georgia's superior courts with jurisdiction to review the tribunals' decisions.   The Court's remedy requires Plaintiffs to leap through four hoops.

- A voter must wait to see whether he or she receives rejection notice.

- The voter must then respond to the notice.   (The TRO does not tell us the means of responding or the timeframe for doing so.)

- If the voter challenges the election official's signature determination, he or she attends a hearing held by an unknown adjudicator.   (The TRO does not tell us who.)

---

believed that a Georgia court, hearing Plaintiffs' claim that they were unlawfully denied the right to vote, would do *nothing* to redress Plaintiffs' harm. *Cf. McKinney*, 20 F.3d at 1563 ("[U]nder *Parratt*, only the state's refusal to provide a means to correct any error . . . would engender a procedural due process violation."). I find that belief to be utterly implausible.

55

- If the adjudicator upholds the official's signature determination, the voter can appeal the decision to the superior court.

That's a fatiguing process, which is made all the more frustrating by the fact that Plaintiffs might still end up in superior court. I would send Plaintiffs directly to superior court—the neutral decisionmaker that wields the constitutional power to remedy their deprivations in the first instance.

### IV.

Set all of this aside, now, and assume that Georgia's mail-in voting scheme does violate procedural due process and thus that the District Court was right to award some remedy. The Court still violated two bedrock constitutional principles when it crafted its injunction. First, in re-writing Georgia's election code, the Court violated the doctrine of federalism, which prevents federal courts from taking action that, if done by a state's own courts, would breach separation of powers. And second, it violated equal protection because in re-writing Georgia's election code, it created a system whereby the same mail-in application or ballot might be counted in one Georgia county but not in another. The Supreme Court's decision in *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525 (2000) (per curiam), forecloses any remedy that, like the District Court's sweeping injunction, lacks "specific standards to ensure its equal application." *Id.* at 106, 121 S. Ct. at 530. I explain each of the District Court's errors in turn.

56

A.

The District Court wrongfully took its finding of a procedural due process violation as an invitation to rewrite Georgia's election code out of whole cloth.    I illustrate how the Court inserted a new provision into the Code and then detail why, under the doctrine of federalism, that insertion amounts to a constitutional violation.

1.

The District Court's injunction creates a new statutory provision in Georgia's election code.    In relevant part, it requires county officials to provide pre-rejection notice, to set up ad hoc administrative tribunals to adjudicate signature disputes, and to allow an attorney to stand in for voters at those proceedings.    It also vests Georgia's superior courts with appellate jurisdiction over the tribunals:

> The county elections official shall . . . provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter.    This process shall be done in good faith and is limited to confirming the identity of the absentee voter consistent with existing voter identification laws.    The elections official is required to send rejection notice via first-class mail and also electronic means, as available or as otherwise required by law.    This process shall include allowing the absentee voter to send or rely upon a duly authorized attorney or attorney in fact to present proper identification. . . .    The absentee voter shall have the right to appeal any absentee ballot rejection following the outcome of the aforementioned process, as

57

designated in [Ga. Code Ann.] § 21-2-229(e).[29]

*Ga. Muslim Voter Project*, slip op. at 2 (N.D. Ga. Oct. 25, 2018) (temporary

restraining order) (citations omitted).   For mail-in ballot applications with

signatures that are determined not to match, the injunction requires election

officials to provide voters with provisional ballots:

> [F]or all ballot applications where a signature mismatch is perceived,
> the county elections official shall . . . provide a provisional absentee
> ballot to the absentee voter along with information as to the process
> that will be followed in reviewing the provisional ballot. . . .   Once
> any provisional ballot is received, the procedure outlined in section 1
> above is to be followed.

*Id.* at 3.

The egregiousness of the District Court's overreaching is apparent once the

injunction is examined alongside Georgia's election code.   The code prescribes

three ways in which a voter's qualifications or right to vote can be challenged.

*See* Ga. Code Ann. §§ 21-2-228 (challenges to voter qualifications by boards of

registrars), -229 (challenges to voter qualifications by other voters), -230

(challenges to the right to vote by other voters).[30] For those mechanisms,

---

[29] The injunction presupposes a system of administrative tribunals because without an administrative hearing and a record thereof, the superior courts would be reviewing an administrative decision without any record before it.

[30] The difference between § 21-2-229 and § 21-2-230 seems to be that a voter can be validly registered to vote yet not have the right to vote. For example, a person that meets all qualifications but for age may register to vote if that person would reach the legal age within six months of registration. Ga. Code Ann. § 21-2-216(c). That said, the person cannot actually

Georgia's legislature outlined intricate procedures for administrative adjudication followed by judicial review in the superior courts.   These procedures, each of which I set out fully in an appendix, *see* Appendix B, outline every possible detail of the adjudicatory process, including filing of a complaint, service of process, standards for allowing a complaint to go forward, burdens of proof, allowances for discovery (including subpoenas), allocations of costs, and timeframes and procedures for appeal.

Sections 21-2-228, -229, and -230 collectively reveal two important facts: first, the District Court contravened Georgia's legislature's will when it wrote into the election code its own provision and relatedly, the legislature deliberately omitted the Court's provision because it would be impossible to implement.

First, the level of detail that §§ 21-2-228, -229, and -230 provide prevent the District Court from hiding behind any assertion that it was merely effectuating the legislature's intent; the legislature knew how to write the Court's remedial scheme for itself had it wanted to.   *Cf. Expressio Unius Est Exclusio Alterius*, Black's Law Dictionary (10th ed. 2014) ("[T]o express or include one thing implies the exclusion of the other . . . .").   Said differently, the purposeful inclusion of the procedures in §§ 21-2-228, -229, and -230 evidences the legislature's purposeful

---

vote until he or she reaches the legal age. *Id.*

exclusion of them from the Statutes—sections within the *same code title*.[31]

Second, the District Court's remedy is unachievable, something that Georgia's legislature was well aware of when it declined to write the Court's remedial scheme into the Statutes.   The challenges created by §§ 21-2-228 and -229 can be conducted at any time because they concern counties' and municipalities' lists of voters, lists that are perpetually in existence.   Indeed, § 21-2-228 charges counties and municipalities with examining voters' qualifications "from time to time."   Ga. Code Ann. § 21-2-228(a).   When examinations can occur throughout the year, administrative adjudications and judicial review are feasible.[32] Here, by contrast, all signature examinations would be forced to occur in a span of less than two months.[33]

---

[31] In evaluating the legislature's intent, we look to the election code as a whole. *See Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*, 734 F.3d 1297, 1302 (11th Cir. 2013) ("[T]he 'fundamental canon of statutory construction is that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme' and that a court should 'fit, if possible, all parts into a harmonious whole.'" (alterations omitted) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33, 120 S. Ct. 1291, 1301 (2000))).

[32] Examinations under § 21-2-229, which authorizes one elector to challenge another elector's qualifications, can also occur throughout the year. Though examinations under § 21-2-230, which authorizes one elector to challenger another elector's right to vote, occur once voting has begun, the volume of challenges under that section pales in comparison to the volume of signature reviews at issue here.

[33] The boards of registrars cannot issue mail-in ballots more than 49 days before a general election, Ga. Code Ann. § 21-2-384(a)(2), and the superintendents of elections must transmit consolidated returns to the secretary of state no later than 5:00 P.M. on the Monday following the election, *id.* § 21-2-493(k).

2.

The Georgia Supreme Court—or for that matter, any Georgia court—could not rewrite the Statutes as the District Court has done here.   The Georgia Constitution requires strict separation of powers.   *See* Ga. Const. art. I, § 2, para. 3 ("The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided.").   That paragraph, at bare minimum, precludes judicial rewriting of statutes.   *See Robinson v. Boyd*, 701 S.E.2d 165, 168 (Ga. 2010) ("Under our system of separation of powers this Court does not have the authority to rewrite statutes." (alteration omitted) (quoting *State v. Fielden*, 629 S.E.2d 252 (Ga. 2006))); *see also Lumpkin Cty. v. Ga. Insurers Insolvency Pool*, 734 S.E.2d 880, 882 (Ga. 2012) ("[A] court of law is not authorized to rewrite the statute by inserting additional language" (quoting *Abdulkadir v. State*, 610 S.E.2d 50, 53 (Ga. 2005))).

Our Constitution, which enshrines federalism, requires us, as a federal court, to respect Georgia's choice on its own governmental structure.[34] As a sister

---

[34] The reason is simple: separation of powers within a state implements federalism's purpose in our constitutional structure. Whereas federal separation of powers secures liberty by diffusing power among coequal branches of the same sovereign, federalism further secures liberty by diffusing power among different sovereigns. *See, e.g.*, *Bond v. United States*, 564 U.S. 211, 222, 131 S. Ct. 2355, 2364 (2011) ("By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power."); *see also Metro. Wash. Airports Auth. v. Citizens for Abatement of*

circuit has said, "Even the narrowest notion of federalism requires us to recognize a state's interest in preserving the separation of powers within its own government as a compelling interest." *White*, 416 F.3d at 773. The court explained that a "state's choice of how to organize its government is 'a decision of the most fundamental sort for a sovereign entity.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S. Ct. 2395, 2400 (1991)).

So what was the District Court to do if it found, contrary to my conclusion, that Georgia's mail-in voting scheme violated procedural due process?

The power that the Supremacy Clause, *see* U.S. Const. art. VI, para. 2, grants federal courts that undertake judicial review of state statutes is limited to refusing to apply state rules of decision that they believe are unconstitutional. *See United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000) ("The remedy if the facial challenge is successful is the striking down of the regulation . . . ." (citing *Stromberg v. California*, 283 U.S. 359, 369–70, 51 S. Ct. 532, 536 (1931))); *see also* Henry M. Hart, Jr. & Albert M. Sacks, *The Legal Process* 154 (1994) ("American courts have no general power of control over legislatures. Their

---

*Aircraft Noise, Inc.*, 501 U.S. 252, 285, 111 S. Ct. 2298, 2316 (1991) (noting that federalism "protects the rights of the people no less than separation-of-powers principles" (citing The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961))). If states in turn choose to embrace separation of powers, liberty is only further protected. *Cf. Republican Party of Minn. v. White*, 416 F.3d 738, 773 (8th Cir. 2005) ("Separation of powers is a concept basic to the states' constitutions as well as the federal Constitution.").

power, *tout simple*, is to treat as null an otherwise relevant statute which they believe to be beyond the powers of the legislature . . . .").   That power does not extend—as the District Court clearly believed—to prescribing *new* rules of decision on the state's behalf.   *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 645 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements.").[35]

The District Court could impose no remedy other than full-on injunction of Georgia's mail-in voting scheme in all of its applications.   The Court, in other words, can offer Georgia a choice: forego mail-in voting altogether—a privilege that the Constitution does not require states to confer—or rework the mail-in voting scheme so that it accords with procedural due process.   As a separate sovereign, Georgia is entitled to make that choice without the District Court's interference.   *Cf. Stanton v. Stanton*, 421 U.S. 7, 18, 95 S. Ct. 1373, 1379 (1975) (holding that the means of remedying a constitutionally defective statute "plainly is an issue of state law to be resolved by the [state] courts on remand"); *see also* Eric

---

[35] Remarkably, courts cannot rewrite statutes even by *striking down* language, rather than by adding it.   Take severability clauses—which this statute noticeably lacks.   In *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016), for example, the state defendant argued for a "narrowly tailored judicial remedy," not facial invalidation, by pointing to a severability clause in Texas' abortion statute. *Id.* at 2318−19. But the Supreme Court responded that a "severability clause is not grounds for a court to 'devise a judicial remedy that entails quintessentially legislative work.'" *Id.* at 2319 (alterations omitted) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329, 126 S. Ct. 961, 968 (2006)).

S. Fish, *Choosing Constitutional Remedies*, 63 UCLA L. Rev. 322, 350 (2016) ("In most cases, courts do not permit themselves to add language.   They cannot, for instance, add new procedures to a statute to satisfy due process requirements . . . .").

Here's the long and short of it: the District Court violated the Constitution's command to respect Georgia's decision to separate its governmental functions. Because Georgia has precluded its state's courts from rewriting its legislative enactments, our Constitution prevents the District Court from doing the same.[36]

## B.

The District Court not only rewrote Georgia's election code, but it did so in

---

[36] Ironically, the District Court could not do to a statute passed by *Congress* what it today does to one passed by Georgia's legislature. *See Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) ("[T]he role of the judicial branch is to apply statutory language, not to rewrite it." (citing *Badaracco v. Comm'r*, 464 U.S. 386, 398, 104 S. Ct. 756, 764 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."); then citing *Blount v. Rizzi*, 400 U.S. 410, 419, 91 S. Ct. 423, 429 (1971) ("[I]t is for Congress, not this Court, to rewrite the statute."); then citing *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1296 (11th Cir. 1999) ("It is not the business of courts to rewrite statutes."))); *Califano v. Westcott*, 443 U.S. 76, 95, 99 S. Ct. 2655, 2666 (1979) (Powell, J., concurring in part and dissenting in part) (reasoning that when a statute is held unconstitutional, "it is the duty and function of the Legislative Branch to review its [statute] in light of [the court's] decision and make such changes therein as it deems appropriate"); *see also* Fish, *supra*, at 339 ("[I]f judges could add language to statutes in ordinary cases, then the judiciary would effectively become a second legislature.").

The District Court's behavior here is in fact worse. Whereas rewriting congressional statutes implicates only the separation of powers between Congress and the Judiciary—two coequal branches within the same sovereign—rewriting state statutes intrudes on the authority of a distinct sovereign. *See Welsh v. United States*, 398 U.S. 333, 367 n.15, 90 S. Ct. 1792, 1811 n.15 (1970) (Harlan, J., concurring in the result) (noting the "limited discretion [the] Court enjoys to extend a policy for the State even as a constitutional remedy" (citations omitted)).

a completely standardless manner—in plain violation of what the Equal Protection Clause requires.

The District Court requires election officials to "provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter." *Ga. Muslim Voter Project*, slip op. at 2 (N.D. Ga. Oct. 25, 2018) (temporary restraining order). It then leaves election officials to fill in the details of that process, requiring only that they do so "in good faith." *Id.* Though "good faith" may be sufficient for an agreement between two friends, it is constitutionally defective guidance to protect the fundamental right to vote.

As the Supreme Court explained in *Bush v. Gore*, "When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." 531 U.S. at 109, 121 S. Ct. at 532. There, various of Florida's 67 counties employed a system whereby voters selected a candidate by punching through the ballot, thus creating a hole next to the candidate's name. *Id.* at 105, 121 S. Ct. at 530. But many voters failed to fully punch the ballot, so the ballots contained partial perforations or, in some cases, only indentations. *Id.* The Florida Supreme Court ordered each of Florida's counties to divine the "intent of the voter." *Id.* The Court explained that the Florida Supreme Court's command was "unobjectionable as an abstract proposition and a starting principle." *Id.* at 106, 121 S. Ct. at 530.

65

The problem, however, "inhere[d] in the absence of specific standards to ensure its equal application." *Id.*   The Court discussed, for example, how the voter's intent varies based on whether, for a ballot to be legally counted, a chad must be completely punched, whether it must only be dimpled, or whether it must only be punched enough so that "any light could be seen." *Id.* at 106–07, 121 S. Ct. at 531.

The District Court's injunction is similarly standardless because it leaves numerous questions unanswered:

- Does the administrative tribunal owe any deference to the election official's decision?   If so, under what standard is the decision reviewed?

- Is evidence admissible?   If so, what evidence?

- How is that evidence obtained, i.e., what discovery is available?

- Who bears the burden of proof?   What burden does that party face?

Because each county can answer these questions differently, Equal Protection rears its head.   The irony, of course, is that Georgia's legislature avoided these *Bush v. Gore* problems when it crafted §§ 21-2-228, -229, and -230, each of which answers the questions that the Court here left for "good faith" implementation.

In short, the District Court could not, in crafting a remedy, create a system of uttlerly standardless review.   When the processes for determining whether two signatures match vary from county to county, the court has provided inadequate

protection for the fundamental right to vote.

* * *

For these reasons, I respectfully dissent.

**Appendix A: District Court's Preliminary Injunction**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RHONDA J. MARTIN, *et al.*,          :
                                     :
                                     :
          Plaintiffs,                :
                                     :
v.                                   :
                                     :
BRIAN KEMP, *et al.*,                :          CIVIL ACTION NO.
                                     :          1:18-CV-4776-LMM
                                     :
          Defendants.                :

---

GEORGIA MUSLIM VOTER              :
PROJECT, *et al.*,                :
                                  :
                                  :
          Plaintiffs,             :
                                  :
v.                                :
                                  :
BRIAN KEMP, *et al.*,             :          CIVIL ACTION NO.
                                  :          1:18-CV-4789-LMM
                                  :
          Defendants.             :
                                  :
                                  :
                                  :
                                  :

## <u>TEMPORARY RESTRAINING ORDER</u>

Based upon the Court's prior findings, <u>see</u> <u>Martin</u> Dkt. No. [23]; <u>GMVP</u> Dkt. No. [28], the Secretary of State's Office shall issue the following instructions to all county boards of registrars, boards of elections, election superintendents, and absentee clerks:

1) All county elections officials responsible for processing absentee ballots shall not reject any absentee ballots due to an alleged signature mismatch. Instead, for all ballots where a signature mismatch is perceived, the county elections official shall treat this absentee ballot as a provisional ballot, which shall be held separate and apart from the other absentee ballots. <u>See</u> O.C.G.A. § 21-2-419; Ga. Comp. R. & Regs. 183-1-14-.03(2). The county elections official shall then provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter. This process shall be done in good faith and is limited to confirming the identity of the absentee voter consistent with existing voter identification laws. <u>See</u> O.C.G.A. §§ 21-2-417, -417.1. The elections official is required to send rejection notice via first-class mail and also electronic means, as available or as otherwise required by law. <u>See</u> O.C.G.A. § 21-2-384(a)(2). This process shall include allowing the absentee voter to send or rely upon a duly authorized attorney or attorney in fact to present proper identification. This process shall be done prior to the certification of the consolidated returns of the election by the election superintendent. <u>See</u>

2

O.C.G.A. § 21-2-230(g). The absentee voter shall have the right to appeal any absentee ballot rejection following the outcome of the aforementioned process, as designated in O.C.G.A. § 21-2-229(e). Any aforementioned appeals that are not resolved as of 5 p.m. on the day of the certification deadline shall not delay certification and shall not require recertification of the election results unless those votes would change the outcome of the election. See O.C.G.A. § 21-2-493(l).

2) All county elections officials responsible for processing absentee ballot applications shall not reject any absentee ballot application due to an alleged signature mismatch. Instead, for all ballot applications where a signature mismatch is perceived, the county elections official shall, in addition to the procedure specified in O.C.G.A. § 21-2-381(b), provide a provisional absentee ballot to the absentee voter along with information as to the process that will be followed in reviewing the provisional ballot. The outer envelope of the absentee ballot provided shall be marked provisional. Once any provisional ballot is received, the procedure outlined in section 1 above is to be followed.

3) This injunction applies to all absentee ballot applications and absentee ballots rejected solely on the basis of signature mismatches submitted in this current election. This injunction does not apply to voters who have already cast an in-person vote.

3

**IT IS SO ORDERED** this 25th day of October, 2018.

_____
**Leigh Martin May**
**United States District Judge**

**Appendix B: Compiled Sections of Georgia's Election Code**

Section 21-2-228

Section 21-2-228 requires the state's counties and municipalities to periodically examine their electors' qualifications.   The board of registrars, upon questioning the right of any existing elector to remain on the list of electors, "shall give such person at least three days' written notice of the date, time, and place of a hearing."   *Id.* § 21-2-228(d).   The board must send notice by first-class mail or by personal service by various law-enforcement officers.   *Id.*   If a majority of the registrars determines that the elector lacks the necessary qualifications, the elector is removed from the list of electors and must be sent notice in the same manner described above.   *Id.* §§ 21-2-228(e), -228(b).   An aggrieved elector "shall have a right of appeal."   *Id.* § 21-2-228(f).   The elector exercises that right by "filing a petition with the clerk of the superior court within ten days after the date of the decision of the registrars."   *Id.*   The board must receive a copy of the petition.   *Id.*   The board's decision "shall stand" unless it is reversed by the court.   *Id.*

The board has broad investigatory powers.   It may "require the production of books, papers, and other material" and "subpoena witnesses," whom it may swear.   *Id.* § 21-2-228(b).   All with at least three days' notice.   *Id.*   As to the witnesses, all summonses, notices, and subpoenas issued by the board are required to be served by designated law-enforcement officers, who receive specified

compensation for these services. *Id.* §21-2-228(c). The witnesses themselves "shall be allowed and paid the same mileage and fee as allowed and paid witnesses in civil actions in the superior court." *Id.* The failure of a subpoenaed witness to attend or testify "shall be reported immediately by the registrars to the appropriate superior court." *Id.* The court "shall order such witness to attend and testify," and the witness, upon refusal, "shall be dealt with as for contempt." *Id.*

Section 21-2-229

Section 21-2-229 allows one elector to challenge the qualifications of a person "applying to register to vote" or "whose name appears on the list of electors," so long as the person is in the same county or municipality. *Id.* § 21-2-229(a). The challenge "shall be in writing and shall specify distinctly the grounds." *Id.* Upon receiving a challenge, the board of registrars "shall set a hearing," notice of the date, time, and place of which "shall be served" upon the challenger and the challenged party. *Id.* § 21-2-229(b). The challenged party "shall receive at least three days' notice" in the manner provided for by § 21-2-228. *Id.* At the hearing, the burden of proof "shall be on the elector making the challenge." *Id.* § 21-2-229(c). After reaching a decision, the registrars "shall notify the parties of their decision." *Id.* § 21-2-229(d). If the challenge is successful, the "application for registration shall be rejected or the person's name removed from the list of electors." *Id.* The aggrieved elector "shall be notified"

in the manner provided for by § 21-2-228.  *Id.*  Both the challenger and the challenged elector "shall have a right of appeal," and the notice requirements for and consequences of appeal match those provided for by § 21-2-228.  *Id.* § 21-2-229(e).

Here too, the code confers broad discovery powers.  Upon petition by the challenger or the challenged elector, the board "shall have the authority to issue subpoenas for the attendance of witnesses and the production of books, papers, and other material."*Id.* § 21-2-229(c).    The requesting party "shall be responsible to serve such subpoenas and, if necessary, to enforce the subpoenas by application to the superior court."  *Id.*  As is the case under § 21-2-228, the witnesses are compensated.  *Id.*

Section 21-2-230

Section 21-2-230 allows one elector to challenge the right of any elector to vote, again so long as the person is in the same county or municipality.  *Id.* § 21-2-230(a).  The challenge "shall be in writing and specify distinctly the grounds." *Id.*  If the challenge is made to a mail-in absentee ballot, it must be lodged before 5:00 p.m. on the day before the election; if it is made to an in-person absentee ballot, or if it is made to any other method of voting, it must be made before the vote is cast.  *Id.*

The board "shall immediately consider such challenge and determine

whether probable cause exists." *Id.* § 21-2-230(b).   If the board finds probable cause, it "shall notify the poll officers" of the challenged elector's precinct or absentee ballot precinct and "if practical, notify the challenged elector and afford such elector an opportunity to answer." *Id.*

What happens thereafter depends on whether the challenged elector casts a ballot and on the grounds for the challenge.

- If the challenged elector seeks to cast a vote at the polls, and if it is practical to conduct a hearing before the close of polls, the board "shall conduct such hearing and determine the merits of the challenge." *Id.* § 21-2-230(h).   If the board sustains the challenge, the elector "shall not be permitted to vote," and if the grounds for the challenge are ineligibility to remain on the list of electors, the elector's name "shall be removed from the list." *Id.*   If the board denies the challenge, the elector "shall be permitted to vote." *Id.*   Even if the polls have closed, the elector may still vote so long as he or she "proceeds to vote immediately after the decision of the registrars." *Id.*

- If the challenged elector seeks to cast a vote at the polls, but if it is impracticable to conduct a hearing before the close of polls or if the board at any time determines that it could not render a decision within a "reasonable time," the elector "shall be permitted to vote by casting a

challenged ballot on the same type of ballot that is used . . . for provisional ballots." *Id.* § 21-2-230(i).   Here too, the elector may still vote even if the polls have closed, so long as he or she "proceeds to vote immediately after such determination of the registrars." *Id.*   If the challenge is based on the eligibility of the elector to remain on the list of electors, the board "shall proceed to finish the hearing prior to the certification of the consolidated returns of the election by the election superintendent." *Id.*   If the challenge is based on other grounds, the board does not need to take further action. *Id.*   Both the challenger and the challenged elector may appeal the board's decision in the same manner as is set out in § 21-2-229(e). *Id.*

- If the challenged elector casts an absentee ballot, and if the challenge concerns the elector's eligibility to remain on the list of electors, the board "shall proceed to conduct a hearing on the challenge on an expedited basis prior to the certification of the consolidated returns of the election." *Id.* § 21-2-230(g).   The election superintendent "shall not certify such consolidated returns until such hearing is complete and the registrars have rendered their decision on the challenge." *Id.*   If the board sustains the challenge, the challenged elector "shall be removed from the list of electors," and the ballot "shall be rejected and not

counted." *Id.* Both the challenger and the challenged elector may appeal the board's decision in the same manner as is set out in § 21-2-229(e). *Id.*

- If the challenged elector casts an absentee ballot, but if it is impracticable to hold a hearing prior the close of polls, and if the challenge is not based on the elector's qualifications to remain on the list of electors, the ballot "shall be treated as a challenged ballot" as provided for by § 21-2-386(e). *Id.* § 21-2-230(e).

- If the challenged elector does not vote, absentee or otherwise, and if the challenge is based on the elector's qualifications to remain on the list of electors, the board "shall proceed to hear the challenge" pursuant to the procedures of § 21-2-229. *Id.* § 21-2-230(f).

- If the challenged elector does not vote, absentee or otherwise, and if the challenge is not based on the elector's qualifications to remain on the list of electors, the board does not need to take further action. *Id.* § 21-2-230(d).